## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| CALLIE A. GOODNICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:13-CV-1157-JAR |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Callie A. Goodnick's ("Goodnick") applicatior for disability insurance benefits under Title II of the Social Security Act. Goodnick alleges disability due to impairments including fibromyalgia and memory loss. (ECF No. 17 at 2).

## I. Background

On May 18, 2010, Goodnick completed her application for disability insurance benefits, alleging disability beginning March 31, 2009. (Tr. 10.) The Social Security Administration ("SSA") denied Goodnick's application for benefits and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Id.) The SSA granted Goodnick's request and a hearing was held on November 3, 2011. (Id.) The ALJ issued a written decision on March 1, 2012, upholding the denial of benefits. (Tr. 10-22.) Goodnick requested a review of the ALJ's decision by the Appeals Council. On April 19, 2013, the Appeals Council denied Goodnick's request for a review. (Tr. 1-6.) The decision of the ALJ thus stands as the final decision of the

Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000). Goodnick filed this appeal on June 18, 2013. (ECF No. 1.) The Commissioner filed an Answer. (ECF No. 6.) Goodnick filed a Brief in Support of her Complaint. (ECF No. 12.) The Commissioner filed a Brief in Support of the Answer. (ECF No. 17.) Goodnick did not file a reply brief in support of her Complaint, but the time for filing such a brief has run. See Case Management Order, ECF No. 5.

## II.    Decision of the ALJ

The ALJ found that Goodnick had severe impairments of fibromyalgia and lumbar degenerative disc disease. (Tr. 12-14.) The ALJ determined that Goodnick's mental impairments of depression and anxiety, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe. (Tr. 13.) The ALJ, however, found that Plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R., part 404, subpart P, appendix 1. (Tr. 14.) The ALJ determined that Goodnick retained the capacity to perform the full range of light work, and that her impairments would not preclude her from her past work as a dental assistant. (Tr. 11-20.) Consequently, the ALJ found Plaintiff was not disabled. (Tr. 21-22.)

Goodnick appeals contending that the ALJ failed to give controlling weight to the opinion of the treating source, Dr. Elizabeth Ballard, on the issues of the nature and severity of Goodnick's impairments. (ECF No. 12 at 8-14.) The Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole, particularly because Goodnick is not credible and the ALJ properly gave little weight to the opinion of Dr. Ballard, who based her opinion upon Goodnick's reported problems.

2

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

#### 1. Goodnick's Testimony

Goodnick testified on November 3, 2011 as follows.

Goodnick is 41 years old. (Tr. 34.) She is 5 foot, 3 inches, and weighs 143 pounds. (Tr. 34.) She has a driver's license and can drive. (Tr. 34-35.) Goodnick went to school until the 8th grade, but obtained her GED. (Tr. 35.) She had additional vocational training in office management about 20 years ago. (Tr. 36.) She last worked in March of 2009 as a dental assistant and office manager. (Tr. 37.) She was fired from her employment for being five minutes late. (Tr. 38.) She did not look for another job after that. (Tr. 39.)

Goodnick was a dental assistant and office manager for several dentists. (Tr. 38-41.) She worked at Golf Graphics in 2000 packaging shirts. (Tr. 41.) In 1997, Goodnick worked for a dog groomer and bathed dogs. (Tr. 42.)

Goodnick testified that she cannot work now because of the pain in her body. (Tr. 42.) She has back spasms and pain in her lower back that goes down her right leg and through her buttocks. (Id.) Her skin is hypersensitive to touch. (Id.) She has fibromyalgia and arthritis. (Tr. 42-43.) Her memory has not been good since her stroke. (Tr. 43.) She had a stroke in 2007; her face became paralyzed on her left side and became numb. (Tr. 43.) She went to St. Anthony's for treatment. (Tr. 44.) She has regained feeling in her left side but it is periodically numb and tingly. (Tr. 44-45.)

Goodnick did not look for other employment after she left Dr. Shadoff's office because she was unable to perform the job. (Tr. 45.) She said that Dr. Shadoff made allowances for her

3

weaknesses due to her illness, particularly her stroke, which other employers would not do. (Tr. 45-46.) In addition, Goodnick noted that Dr. Shadoff's office was a slower office and that she would not be able to keep up with a busy dentist's office. (Tr. 46.)

Goodnick never regained the full strength in her hands, but it is better than it was immediately after her stroke. (Tr. 47.) Goodnick sees Dr. Maude, a pain specialist, and a chiropractor. (Id.) She does not have a general practitioner. (Id.)

Goodnick takes several medications, including fifteen milligrams of Percocet every day. (Tr. 47-48.) She said that the medications help but do not take all of the pain away. (Tr. 48.) Goodnick sees a chiropractor, who helps her neck and upper back but is unable to relieve the pain in her lower back, her spasms, or her fibromyalgia. (Tr. 49.) Her pain is constant and is a "7" on a scale of 1 to 10 when she takes her medicine. (Id.) Nothing makes her pain better. (Tr. 50.)

Goodnick sees a rheumatologist, Dr. Hamid Bashir, who diagnosed her with fibromyalgia and arthritis. (Tr. 50.) Goodnick requested a letter from Dr. Bashir that she was not able to work. (Tr. 50-51.) She claimed she needed this so her husband, who had been laid off, could collect his unemployment benefits. (Tr. 51.)

Goodnick has trouble standing and walking when she has spasms. (Tr. 51.) She has spasms several times a day for several minutes. (Id.) Her spasms can last from just seconds to several minutes. (Tr. 52.) Goodnick can walk but she has trouble standing still. (Id.) Goodnick began having this severe pain two years ago (in 2009) after she was in a motorcycle accident. (Tr. 52-53.) She fell off the back of a motorcycle and slid down the road, hit her head and got gravel on her back. (Tr. 53-54.) She did not go to the hospital. (Tr. 53-54.) The pain gradually

4

came on after the accident. (Tr. 55.) She had her stroke before the motorcycle accident. (Tr. 55.)

Goodnick can climb a flight of stairs. (Tr. 55.) Her bedroom is on the second floor. (Id.) They put in two railings to assist her in climbing stairs. (Tr. 56.) She can bend over but has difficulty coming back up. (Id.) She can write with a pen or pencil. (Id.) She can pick up a gallon of milk with both hands but would drop it if she lifted it with one hand. (Id.) She can pick up a half gallon of milk. (Id.) She, her husband, and her six year old daughter moved in with her mother-in-law. The mother-in-law helps take care of the six year old daughter, and does the laundry, cleaning and cooking. (Id.) Goodnick does not do any household chores. (Tr. 57.)

Goodnick has trouble remembering what she is supposed to do. (Tr. 57.) She gets aggravated with people easily. (Id.) She can put dishes away. (Id.) She cannot pick up her Boston Terrier dog but she gives it food and water and takes the dog outside. (Tr. 58.) She cannot clean the cat's litter box. (Id.) She no longer crochets because it hurts her hands. (Tr. 58-59.) She leaves the house for family get togethers and rides with her daughter and mother-in-law. (Tr. 59.) She can walk to the grocery store. (Id.) She watches a lot of television. (Id.) She can make it through an entire television program if she changes positions frequently. (Id.) She does not read. (Tr. 60.) She could read a magazine article. (Id.) She can help her daughter with her schoolwork. (Id.)

Goodnick takes Meclozine for vertigo. (Tr. 60.) She has trouble with dizziness four to seven times a day, particularly when she walks up stairs. (Id.) She only has trouble with driving if there are cars on both sides of her; this affects her vertigo. (Tr. 60-61.) Most days, Goodnick picks up her daughter from school, which is just a couple minutes from her house. (Tr. 61.)

Goodnick falls down on the stairs a lot. (Tr. 61.) She last fell in May. (Id.)

5

Goodnick has a low energy level. (Tr. 62.) She has trouble staying awake during the day, which may be a side effect of her medicine. (Id.) She usually gets between four to six hours of sleep at night, off and on. (Id.)

Goodnick has no problem grooming herself. (Tr. 62.) She cannot pick up or play with her six year old daughter. (Tr. 62-63.) She sits outside with her daughter. (Tr. 63.)

## 2.   Vocational Expert's Testimony

The vocational expert, Tracy Young, testified as follows:

Ms. Young testified that Goodnick has vocational experience as a dental assistant, DOT number 709.361-018, which is a light skilled job with an SVP ("Specific Vocational Preparation") of 6. The DOT description includes a clerical aspect of the dental assistant position, and it is not a separate title. (Tr. 65.) Goodnick also worked briefly as a hand packager, DOT number 920.587-018, which is a medium unskilled job with an SVP of 2.

The ALJ posed two hypotheticals to Ms. Young. In the first hypothetical, the person was of the same age, education, and work experience as the claimant. The person was capable of performing at the sedentary exertional level. The person is limited in that she can only occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. The person needs to avoid exposure to unprotected hazards, such as heights and machinery and avoid concentrated exposure to extreme cold. (Tr. 66.) Ms. Young testified that such person would not be able to perform any of claimants' past work. (Tr. 66-67.) However, such person could perform the job of telemarketer, which is a semi-skilled job with an SVP of 3. (Tr. 67.) She could also work as an addresser, which is a sedentary unskilled job with an SVP of 2. (Id.) She could also work as a document specialist, which is a sedentary unskilled job with an SVP of 2. (Id.)

6

For the next hypothetical, the vocational expert was to assume that such a person would be absent from work for up to four times a month due to medical issues. (Tr. 67.) Ms. Young testified that such person would not be able to perform any work. (Tr. 68.)

**B.    Medical Records**

Goodnick's relevant medical records are summarized as follows:

On November 25, 2009, Goodnick was seen by Bryan Burns, D.O., at St. Anthony's physicians, and diagnosed with fatigue and malaise. (Tr. 229-30.) Dr. Burns prescribed Lexapro and Effexor. (Id.) On December 23, 2009, Goodnick was seen by Dr. Burns for crying and not sleeping. (Tr. 228.) Dr. Burns prescribed Prozac and Ambien and ordered her to stop Effexor. (Id.)

On March 9, 2010, Goodnick was seen by Dr. Elizabeth Ballad, at St. Anthony's physicians, for sleep disturbance, depression, dizziness, memory loss, energy change, and concentration. (Tr. 223-25.) She denied suicidal ideations, racing thoughts, hallucinations, or paranoia. (Id.) Dr. Ballad diagnosed Goodnick with fatigue, malaise, insomnia, and depression. (Id.)

On March 23, 2010, Goodnick complained of low back pain and pain radiating down her legs. (Tr. 222.) Dr. Ballard diagnosed her with insomnia, depression with anxiety, and low back pain. (Id.) Dr. Ballard prescribed Goodnick Cymbalta and ordered her to discontinue Prozac. (Id.)

On March 25, 2010, Goodnick called Dr. Ballard. Goodnick complained of side effects of the Lyrica and anxiety. (Tr. 402.) Dr. Ballad diagnosed her with depression with anxiety and fibromyalgia. (Id.) Dr. Ballard ordered Prozac and Xanax. (Id.)

7

On April 19, 2010, Goodnick saw Dr. Ballard. (Tr. 218-19.) Goodnick reported that the Cymbalta was "working well for her mood." Goodnick was diagnosed with fibromyalgia and insomnia and was prescribed a Neurotonin capsule and Ambien.

On May 10, 2010, Goodnick saw Dr. Ballard for vertigo. (Tr. 216-17.) Goodnick was diagnosed with fibromyalgia and ordered to stop Cymbalta and start Lyrica. (Tr. 216-17.)

On June 2, 2010, Goodnick saw Dr. Ballard, complaining of side effects of Lyrica and that the Buspar was not helping her anxiety. Goodnick was diagnosed with depression with anxiety and fibromyalgia. Dr. Ballard ordered her to stop Buspar and start Xanax and Prozac. Dr. Ballard thought treating the depression and anxiety would also help her fibromyalgia. (Tr. 214-15.)

On July 12, 2010, Goodnick had an appointment with Dr. Ballard for complaints of joint pain and stiffness and fatigue. (Tr. 212-13.) The physical examination revealed tender points bilaterally at the base of her neck, bilateral trapezius muscle, bilateral mid-paraspinal muscles, bilateral low back over the S/I joints, bilateral greater trochanter, bilateral knees (medially and above the knee cap), bilateral elbows and sternum. Goodnick was diagnosed with insomnia and fibromyalgia. Goodnick was ordered to take Savella for her fibromyalgia.

On July 26, 2010, Goodnick saw Dr. Ballard for a follow up appointment regarding her fibromyalgia. (Tr. 210-11.) Goodnick claimed that the Savella was not working and that she "hurt[] all over." Dr. Ballard diagnosed Goodnick with fibromyalgia, tobacco dependence, and depression. Dr. Ballard prescribed Chantix for smoking cessation and Xanax for depression and ordered Goodnick to discontinue Savella. Dr. Ballard referred Goodnick to a rheumatologist.

On August 6, 2010, Goodnick was seen by Dr. Hamid Bashir, a rheumatologist. (Tr. 245-47.) Dr. Bashir found pain in joints at multiple sites. He found no evidence of joint

8

inflammation, which was consistent with a diagnosis of fibromyalgia. (Id.) Dr. Bashir found some inflammatory symptoms and weakness in Goodnick's hand grip, which made Dr. Bashir concerned about inflammatory polyarthritis.

On September 9, 2010, Dr. Ballard authored a medical source statement (MSS) for the Social Security Office regarding Goodnick's physical RFC. (Tr. 281-86.) Dr. Ballard noted that Goodnick has pain in four quadrants of the body; she has "tender points in 16 of the 18 tender points" due to fibromyalgia, severe fatigue, and depression from chronic pain. Dr. Ballard expected Goodnick's impairments to last at least twelve months and found Goodnick's symptoms to be severe enough to interfere with her attention and concentration frequently (or 75% of the time). Dr. Ballard stated that Goodnick's symptoms will interfere with her capacity for competitive employment to the extent that she will be unable to maintain the persistence and pace required to engage in competitive employment. Dr. Ballard believed that Goodnick's symptoms would slightly impair her ability to perform activities of daily living. Dr. Ballard stated that movement/overuse, temperature extremes, work stress, and static positioning could all cause an exacerbation or flare up of Goodnick's symptoms. Dr. Ballard indicated that it would be medically reasonable that Goodnick may need to lie down or recline periodically throughout the day to relieve or reduce the symptoms of Goodnick's impairments. Dr. Ballard estimated that Goodnick would need to be absent from any employment four or more times per month due to her physical impairments. Dr. Ballard said it would be reasonable to expect Goodnick to experience fatigue from her condition and that such fatigue would moderately impair her ability to work. Dr. Ballard stated that Goodnick would require 4-6 breaks of 15 minute duration during an 8 hour work day, and that such breaks could not be scheduled. Dr. Ballard advised that Goodnick could not lift more than 10 pounds; must avoid repetitive movements; must be able to

9

walk, stand and sit as needed; and no frequent bending, stooping, above the head motion, or kneeling. Dr. Ballard indicated that Goodnick could occasionally carry 10 pounds or less and can never carry over 10 pounds. Dr. Ballard stated that Goodnick can continuously sit or stand for at most 30 minutes.

On September 16, 2010, Goodnick saw Dr. Bashir and reported widespread pain, particularly in the right shoulder with full flexion and internal rotation. (Tr. 288-89.) Goodnick reported that she was unable to pick up her grandson and seemed frustrated with her daily pain. Goodnick stated that Percocet helped but she had to take it every 6 hours. Dr. Bashir treated Goodnick with Lyrica and an intra-articular injection of depomedrol for her shoulder.

On September 27, 2010, Goodnick reported arthalgias, myalgias, headaches and bilateral knee pain to Dr. Nehal Modh at Progressive Pain Management. (Tr. 296.) Dr. Modh ordered x-rays, discontinued Mobic, prescribed Savella and Celebrex and refilled Goodnick's Percocet prescription.

On October 14, 2010, Goodnick was seen by Dr. Modh for knee pain, abdominal muscle spasms, and continued left greater than right upper extremely dysesthesia. (Tr. 295.) Dr. Modh noted that Goodnick's symptoms improved after a steroid injection. Dr. Modh administered another steroid injection in the right knee and refilled Goodnick's Percocet and Zanaflex.

On November 9, 2010, Goodnick reported generalized osteoarthritis pain affecting her major joints and headaches to Dr. Modh. (Tr. 293.) Dr. Modh reported that Goodnick was stable and had very good response to Fioricet. A physical examination revealed that Goodnick had reduced cervical flexion and extension and mildly reduced rotation bilaterally. Dr. Modh prescribed Mobic and Fioricet and recommended a c-spine facet steroid injection at Goodnick's next visit.

10

On December 2, 2010, James Morgan, Ph.D. performed a psychiatric review of Goodnick's medical records. (Tr. 300-10.) He determined that Goodnick's mental impairments were not severe. Dr. Morgan found that Goodnick suffered from depression and anxiety. Dr. Morgan noted that Goodnick takes medications for these conditions that are prescribed by her family care physician. She does not receive any psychological treatment. He found that Goodnick had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.

Counsel for Goodnick requested treatment records for the period from November 10, 2010 through September 21, 2011. (Tr. 312.) The dates for the following entries were not provided:

a. Goodnick was stable but reported that the Buspar was not working well and she wanted to restart Xanax. (Tr. 314.) Dr. Modh noted that Goodnick's SI joint symptoms had improved.

b. Goodnick reported that she was doing well with Buspar but complained of poor sleep. (Tr. 315.) Her SI joint was 90% improved after her steroid injection. Dr. Modh noted arthralgia, myalgia, depression, muscle spasms, and joint osteoarthritis. Dr. Modh increased Goodnick's dosage of melatonin and ordered her to start taking Lyrica.

c. Goodnick reported pain in her coccyx and bilateral joints with sciatic distribution. Dr. Modh noted reduced lumbar flexion. (Tr. 317.) Dr. Modh determined that Goodnick had decreased lumbar flexion. Dr. Modh administered a steroid injection to Goodnick's right SI joint.

11

d. Goodnick told Dr. Modh that she had low back pain at L3/4-L5/S1, which was aggravated by excessive activity. (Tr. 318.) Dr. Modh ordered Goodnick to continue taking Buspar and increased her Percocet dosage.

e. Goodnick complained of increased pain. Dr. Modh identified pain at L3/4-L5/S1. (Tr. 319). Dr. Modh ordered Goodnick to continue Percocet, Lexapro and Mobic.

f. Goodnick reported "doing great overall". She said that her left hand carpal tunnel symptoms had resolved but she complained of L3-5 muscle spasms. (Tr. 320.) Dr. Modh determined that Goodnick had reduced lumbar flexion and extension and negative straight-leg raise. Dr. Modh decreased Savella and recommended two steroid injections to Goodnick's left lumbar paraspinal muscle.

g. Goodnick reported continued lower back pain, left carpal tunnel symptoms, and right shoulder pain. (Tr. 321.) Dr. Modh noted reduced lumbar flexion and extension and prescribed a steroid injection to treat carpal tunnel syndrome.

h. Goodnick complained of left knee pain and generalized osteoarthritis pain. (Tr. 322.) Dr. Modh gave Goodnick a left steroid injection and continued to prescribe medication.

i. Goodnick was stable, with no pain symptoms on methadone. (Tr. 323.) Dr. Modh increased Goodnick's methadone and refilled her Lexapro, Zanaflex, Amitriptyline, Percocet and Mobic.

j. Goodnick reported doing better overall but she was waking up at night due to pain. (Tr. 324.) Dr. Modh gave her a right shoulder joint injection, he prescribed methadone and decreased her Percocet.

k. Dr. Modh wrote, "Patient will not be able to work until further notice and has a lifting restriction of 15 pounds." (Tr. 325.)

12

l. On January 24, 2011, Goodnick reported right shoulder pain and low back pain. (Tr. 329.) Dr. Modh administered a coccyx steroid injection. (Tr. 328.)

m. On February 7, 2011, Goodnick indicated that the coccyx steroid injection was helpful. (Tr. 327.) She complained of severe dysesthesia, insomnia and low back pain. Dr. Modh decreased Goodnick's Savella and started her on Amitriptyline.

n. On February 22, 2011, Goodnick complained of insomnia, right low back pain, and spasms. (Tr. 326.) Dr. Modh continued Goodnick on Lexapro and increased her Xanax, Amitriptyline, and Percocet.

Goodnick was treated at Logan College of Chiropractic from July 1, 2011 through September 23, 2011 for pain management, to increase her range of motion and to regain her active lifestyle. (Tr. 349-56.) At one point, she felt that her pain was about 60% resolved and she noted that she was becoming more active. (Tr. 353.)

**IV. Legal Standard**

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." Id. "The sequential evaluation process may be

terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work.[1] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008); see also Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. Id.; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R.

---

[1] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." Mueller v. Astrue, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

14

§ 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. Id.; see also 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." Goff, 421 F.3d at 790; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id.; see also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. See Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002); see also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

[t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

15

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. Krogmeier, 294 F.3d at 1022.

## V. Discussion

Goodnick asserts that the ALJ failed to properly consider opinion evidence. Specifically, Goodnick criticizes the ALJ for discrediting Dr. Ballard. (ECF No. 12 at 9-13.) Goodnick argues that although the ALJ found fibromyalgia to be a severe medically determinable impairment, but the ALJ did not seem to understand the signs necessary to establish fibromyalgia. (ECF No. 12 at 9.)

Goodnick also asserts that the ALJ failed to explain how normal status examinations justified giving no weight to Dr. Ballard's opinion that Goodnick's physical impairments caused multiple exertional and non-exertional limitations, including rest breaks secondary to fatigue. (ECF No. 12 at 10.) Goodnick contends that the mere fact that she can perform everyday physical acts does not mean that she is not disabled. (Id.) Goodnick asserts that the ALJ never determined what activities of daily living that Goodnick performed were inconsistent with the inability to perform the daily physical acts required of competitive employment. (ECF No. 12 at 11.) Goodnick asserts that Dr. Ballard's opinion was based on objective findings and not solely Goodnick's subjective complaints. (ECF No. 12 at 11.) Goodnick maintains that Dr. Ballard's opinion "was not inconsistent with: her own treatment notes; the treatment notes of Doctors Bashir and Modh; the opinion of Dr. Modh confirming Plaintiff 'will not be able to work until further notice and has a lifting restriction of 15 pounds;' (Tr. 325) and the opinion of Dr.

16

Burchett, the consultative examiner (CE)." (ECF No. 12 at 12.) Goodnick claims that because her doctors prescribed her with narcotic medication that the ALJ should have considered that Goodnick's doctors "obviously determined Plaintiff was experiencing great pain." (ECF No. 12 at 12.) Goodnick also asserts that the ALJ failed to give good reasons to reject the opinion of Goodnick's treating physician, Dr. Ballard. (ECF No. 12 at 12.) Goodnick claims that the ALJ rejected Dr. Ballard's opinion without properly considering the factors set forth in 20 CFR §404.1527(c)(1)-(6), such as the examining and treatment relationship, length of treatment relationship and the frequency of examination, supportability and consistency. (ECF No. 12 at 13.) Goodnick also argues that the ALJ failed to identify any medical opinion upon which she based Goodnick's RFC because the ALJ gave no weight to the opinions of Goodnick's treating physicians, Drs. Ballard and Modh, and gave little weight to the opinion of the CE. (ECF No. 12 at 13.) Goodnick asserts that the ALJ failed to determine whether insomnia and fatigue would have affected her RFC assessment. (ECF No. 12 at 13.) In addition, Goodnick maintains that the ALJ should have determined whether Goodnick's pain had a psychogenic overlay. (ECF No. 12 at 13.) Goodnick notes that Dr. Ballard prescribed an anti-depressants to determine whether it would help Goodnick's fibromyalgia. However, Goodnick complains that there is no indication that the ALJ considered that Goodnick's pain could have had its origin in a psychological disorder. (ECF No. 12 at 14.) Finally, Goodnick claims that the ALJ erroneously gave great weight to the opinion of James Morgan, PhD, the non-examining medical consultant who found that Goodnick did not have a severe mental impairment. (ECF No. 12 at 14.) Goodnick asserts that relying on a non-examining, non-treating physician to form the RFC does not fully and fairly develop the record.

17

In response, the Commissioner claims that the ALJ properly did a detailed credibility analysis and carefully determined Goodnick's RFC. The ALJ found Goodnick's complaints were not entirely credible for several reasons, including the lack of objective evidence to support her claims, Goodnick's symptom exaggeration and inconsistent statements, the relatively conservative treatment Goodnick received for her physical impairments, evidence that treatment was successful in addressing her physical symptoms, the minimal treatment she received for her mental problems, and Goodnick's activities of daily living. The Commissioner noted that Goodnick complained to multiple primary care physicians, emergency room personnel, a rheumatologist, and a pain specialist but, with the exception of self-reports of symptoms of fibromyalgia, her physical exam findings were completely normal. (ECF No. 17 at 5). Goodnick had a normal electrocardiogram, a normal head CT scan, and normal chest, cervical, and lumbar x-rays. (ECF No. 17 at 5 (citing Tr. 16-17, 270-72, 297-98.)) Goodnick's rheumatologist twice concluded that Plaintiff had a normal range of motion, normal gait, and full strength in all extremities. (ECF No. 17 at 5 (citing Tr. 17, 246, 289.)) The ALJ also found evidence that Goodnick exaggerated her symptoms for financial gain. During Dr. Burkett's consultative examination, he noted that Goodnick claimed tenderness at eleven of twelve control points, including the middle of her forehead and left thumbnail. (ECF No. 17 at 5 (citing Tr. 20, 478.)) The ALJ also noted that Goodnick made unsubstantiated statements that she had suffered a stroke and that she had been hospitalized with a MRSA infection. (ECF No. 17 at 5-6).

The ALJ also discerned that the treatment of Goodnick's physical complaints was "routine and conservative in nature." (ECF No. 17 at 6 (citing Tr. 19.)) After Goodnick's multiple self-reports of pain, she was diagnosed with fibromyalgia, but she only saw her rheumatologist, Dr. Bashir twice. (ECF No. 17 at 6 (citing Tr. 17, 19, 245-47, 288-89.)) The

18

Commissioner contends that this conservative treatment calls into question the severity of Goodnick's fibromyalgia symptoms. (ECF No. 17 at 6.)

In addition, the Commissioner maintains that the medical records demonstrate that medication and treatment have been effective in addressing Goodnick's symptoms. When Goodnick complained of joint pain and migraine headaches, she responded very well to Fioricet. Likewise, Goodnick later reported that she was "doing better overall" after another medication adjustment. (Tr. 18, 324.) Goodnick also reported improvements from chiropractic treatment. (Tr. 18, 351-53.) The Commissioner argues that because this evidence suggests that Goodnick's pain has responded well to treatment, it is non-disabling. (ECF No. 17 at 7.)

The Commissioner also argues that Goodnick's mental health reports did not indicate that her problems were severe. (ECF No. 17 at 7.) Goodnick never saw a mental health specialist for treatment and her mental status exams were consistently normal. (ECF No. 17 at 7 (citing Tr. 18-19.))

The Commissioner contends that Goodnick's daily activities indicated that she was capable of more than she alleged. (ECF No. 17 at 8.) The Commissioner outlined several activities, including caring for herself and her five-year-old daughter, which discredited a finding of disability. (Tr. 13, 153-56.) Based upon this, the ALJ concluded that Goodnick's level of activity was "inconsistent with the inability to perform any work." (Tr. 19.)

The Commissioner emphasizes that the mere fact that Goodnick interprets the medical evidence differently than the ALJ is not a basis for remand. The Commissioner contends that the ALJ's findings are based upon substantial evidence and must be upheld, even if another interpretation is possible. (Tr. 17 at 8.)

The Commissioner maintains that the ALJ properly determined Goodnick's RFC based upon the medical evidence. Dr. Morgan's psychiatric review showed that Goodnick was no more than mildly limited in any functional capacity and had experienced no extended episodes of decompensation. (Tr. 18-19, 300-310.) The ALJ found that this evaluation was consistent with the entire record and afforded it great weight. In contrast, the ALJ afforded Dr. Ballard's medical opinion no weight because it was inconsistent with her treatment notes, which regularly found that Goodnick's mental status was normal with medication. (ECF No. 17 at 11.) Dr. Ballard also opined that Goodnick's symptoms only slightly impaired her ability to perform activities of daily living, which was inconsistent with her opinion that Goodnick was unable to perform any work. (ECF No. 17 at 11.) The ALJ further determined that Dr. Ballard's opinion as to Goodnick's limitations was inconsistent with the objective evidence, which showed only mild degenerative disc disease, full range of motion, and full muscle strength. (Tr. 19.) The Commissioner asserts that these inconsistencies undermined the credibility of Dr. Ballard's opinion, which caused the ALJ to reduce the weight afforded to it. The ALJ noted that Dr. Ballard appeared to base her entire opinion on Plaintiff's subjective reports. (ECF No. 17 at 11 (citing Tr. 19).) In light of the credibility factors, the Commissioner claims that the ALJ properly reduced the weight of Dr. Ballard's opinion to the extent that it was derived from Goodnick's unreliable allegations. (ECF No. 17 at 11.)

The Commissioner further asserts that the ALJ properly gave no weight to the one-sentence letter written by Dr. Modh. (ECF No. 17 at 11-12.) The letter stated that Goodnick could not work until further notice and was restricted to lifting no more than fifteen pounds, but provided no objective medical basis for his opinion. (Tr. 19, 325.)

In addition, the Commissioner contends that the ALJ gave little weight to the opinion of Dr. Barry Burchett, particularly his December 23, 2011 medical exam, because it was based upon Goodnick's self-reported medical history. (ECF No. 17 at 12.) The Commissioner, however, states that Dr. Burchett's objective medical findings support the ALJ's opinion, including: Goodnick walked with a normal, steady gait and did not require a cane; was stable at station and comfortable in supine and sitting positions; had negative straight-leg-raising tests; had full range of motion of the spine; showed no evidence of compression neuropathy in her legs; and showed no neurological evidence of having had a cardiovascular event, such as a stroke. (Tr. 478, 480.) Dr. Burchett also observed that Goodnick reported tenderness in seventeen of eighteen standard trigger points, nine of ten random trigger points, and two of two standard control points, which led him to note that Goodnick "complained of tenderness virtually everywhere [he] touched her," and to diagnose *possible* fibromyalgia. (Tr. 20, 478,-79.) Thus, the Commissioner noted that although the ALJ gave little weight to Dr. Burchett's opinions, which were derived from Goodnick's subjective reports, the ALJ found that Dr. Burchett's objective findings were "more consistent with the ability to perform light work" and reflective of the entire medical evidence in the record. (Tr. 20.)

The Commissioner contends that the ALJ provided good reasons for giving Dr. Ballard's opinion little weight. The ALJ properly addressed Goodnick's daily activities because such behaviors were not consistent with an inability to perform any kind of work. (ECF No. 17 at 13.) The Commissioner notes that, although Goodnick highlights out-of-context examples from the record which suggest that her symptoms might be disabling, the overwhelming evidence in the record indicates that Goodnick "wildly exaggerated the severity of her impairments" and "made inconsistent claims throughout the relevant period." (ECF No. 17 at 13.) Further, the

Commissioner contends that the ALJ was able to discount Goodnick's subjective medical complaints by reading the medical record and evaluating the objective medical evidence. (ECF No. 17 at 14.)

Finally, based upon the ALJ's evaluation of the objective medical evidence, the ALJ discerned that Goodnick could perform her past work as a dental assistant or, in the alternative, could perform other work existing in significant numbers in the national economy. (ECF No. 17 at 15.) Thus, the Commissioner notes that, whether or not Goodnick could return to her past work, she was not disabled as she retained the ability to perform light work. (Id.)

The Court finds that the Commissioner properly addressed Goodnick's credibility when determining her RFC. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001)("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility."). After reviewing all of the evidence the ALJ determined that Goodnick's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible to the extent that they [were] inconsistent" with the RFC. (Tr. 15.)

The Court also believes that the ALJ properly gave Dr. Ballard's opinion and Dr. Modh's one sentence letter little weight. As noted by the Commissioner, Dr. Ballard largely based her opinion upon Goodnick's self-reported (and largely discredited) pain and limitations. Moreover, the objective findings by Dr. Ballard did not support the limitations she placed on Plaintiff. In particular, Dr. Ballard's records indicated that Goodnick had only a slight impairment in the activities of daily living; she had only mild degenerative disc disease, full range of motion, and full muscle strength. Based upon these inconsistences, the Court finds that the ALJ properly gave Dr. Ballard's evaluation little weight. Likewise, the Court believes that the ALJ properly discounted Dr. Modh's one sentence letter stating that Goodnick could not work or lift in excess

22

of 15 pounds. (Tr. 325.) Dr. Modh provides no basis for this restriction and it is not supported in the record. Accordingly, the Court finds that the ALJ was correct in not crediting it when developing Goodnick's RFC.

The evidence also indicates that Goodnick's mental health problems were non-severe. Goodnick was never hospitalized for mental health issues and did not regularly seek the assistance of a mental health professional. She was regularly on anti-depressants and there is no indication that these medications failed to adequately control her symptoms. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Brace v. Astrue, 578 F.3d 882, 885 (8th Cir.2009); Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010). "Her symptoms have since been effectively controlled by her medication." Brown, 611 F.3d at 955. Based upon this evidence the Court believes that the ALJ properly gave great weight to the psychiatric review of Dr. Morgan who found that Goodnick's mental impairments were not severe.

Moreover, the relatively conservative treatment of Goodnick's physical ailments indicates that they were also non-severe. Goodnick was not hospitalized, did not require surgery and has rarely sought emergency room treatment. She experienced significant relief from steroid injections, chiropractic treatments and other routine treatments. She was referred to a rheumatologist but only sought treatment from him twice. These routine treatments indicate that Goodnick's physical problems were not disabling. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)(holding claimant was not disabled where "[t]he ALJ also noted that although Black does experience some limitation, pain, and discomfort, she has never undergone surgery and has relied on a conservative course of treatment, including exercises, home cervical traction, a back brace, and medication").

23

Additionally, Goodnick's daily activities, in conjunction with other evidence in the record, support the ALJ's finding that Goodnick is capable of performing light work. See Brown, 611 F.3d at 955-56. "[A]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). The ALJ cited to testimony at the hearing that established Goodnick's daily activities, including taking care of her five-year-old daughter, including taking her to and from school; running errands, including grocery shopping; paying bills; performing chores around the house; cooking meals; handling her own personal care; and walking on a treadmill. (Tr. 13, 153-56.) Likewise, Dr. Ballard, Plaintiff's primary care physician indicated that Goodnick was only slightly impaired in her ability to perform daily activities. (Tr. 19, 283.)

Finally, the Court notes that there is ample support in the record for the ALJ's determination that Goodnick was capable of performing light work and not disabled. In addition to the activities of daily living described above, there was also sufficient medical evidence to support the ALJ's RFC finding. For example, on November 9, 2010, Goodnick reported a very good response to her pain from Fioricet (Tr. 293), Goodnick reported that she was stable (Tr. 314, 323), Goodnick reported that her SI joint was 90% improved after a steroid injection (Tr. 315), Goodnick reported "doing great overall," and Goodnick stated that she was without pain symptoms (Tr. 323.) The Court acknowledges that there is also evidence in the record, particularly from Goodnick's own reports, that would support a finding of disability. However, if inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the

opposite conclusion. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). Based upon the totality of the record, the Court finds that the ALJ's decision was supported by substantial evidence and should be affirmed.

**VI.    Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 22th day of September, 2014.

John A. Ross

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE